**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1) Jet Maintenance, Inc.<br><br>Plaintiff<br><br>v.<br><br>2) Devon Energy Production Company, L.P.;<br>3) Devon Gas Services, L.P.; and<br>4) Southwestern Gas Pipeline, Inc.;<br><br>Defendants | Case No. 22-CV-263-SLP |

---

**DEFENDANTS' MOTION TO RECONSIDER OR, IN THE ALTERNATIVE, MOTION TO CERTIFY QUESTION TO THE OKLAHOMA SUPREME COURT**

---

Timothy J. Bomhoff, OBA #13172
Laura J. Long, OBA #22215
Katelyn M. King, OBA #33937
McAfee & Taft A Professional Corporation
Two Leadership Square, 8th Floor
211 North Robinson
Oklahoma City, OK 73102-7103
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
tim.bomhoff@mcafeetaft.com
laura.long@mcafeetaft.com
katelyn.king@mcafeetaft.com

**ATTORNEYS FOR DEFENDANTS, DEVON ENERGY PRODUCTION COMPANY, L.P., DEVON GAS SERVICES, L.P. AND SOUTHWESTERN GAS PIPELINE, INC.**

March 24, 2023

# TABLE OF CONTENTS


I. Motion to Reconsider ..... 1

A. Legal Standard for Reconsideration ..... 2

B. Basis for Reconsideration: A well pad is not a drilling rig or a structure ..... 2

C. Basis for Reconsideration: A well is not a structure ..... 5

D. Basis for Reconsideration: the statute requires that the contract at issue be for *construction of* a structure, not simply *use of* a structure ..... 6

E. Basis for Reconsideration: A well pad is not "other works dealing with construction." ..... 8

F. Basis for Reconsideration: Wrong standard ..... 10

II. Motion to Certify Questions to the Oklahoma Supreme Court ..... 12

A. Facts Relevant for Certification ..... 13

B. Special Law Violation Under Art. 5, § 59 ..... 14

1. What does Section 221 do? ..... 15

2. Step 1: How does Section 221 separate classes? ..... 16

3. Step 2: Can a general law be applied? ..... 18

4. Step 3: Is the special treatment legislatively justified? ..... 20

C. Due Process Violation Under Art. 2, § 7 ..... 21

1. Judicial ruling contradictory to legislative decisions violates due process ..... 21

2. Error in statutory construction violates due process ..... 22

3. Application of the "construction" statute to nearly limitless activities violates due process ..... 23

4. Discrimination in industries violates due process ..... 24

III. Conclusion ..... 25

CERTIFICATE OF SERVICE ........................................................................... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC*,
703 F.3d 1147 (10th Cir. 2013) .......... 2

*Burks v. Walker*,
109 P. 544, 549 (Okla. 1909) .......... 25

*Chesapeake Operating, LLC v. C.C. Forbes, LLC*,
No. CIV-20-557-R (W. D. Okla. March 8, 2023) .......... 5

*Dayton Hudson Corp. v. Am. Mut. Liab. Ins. Co*.,
621 P.2d 1155 (Okla. 1980) .......... 10

*Fretwell v. Protection Alarm Co*.,
764 P.2d 149 (Okla. 1988) .......... 8, 16, 18, 19

*Hendricks v. Jones ex rel. State ex rel. Oklahoma Dep't of Corr.*,
349 P.3d 531, 534 (Okla. 2013) .......... 24

*Reynolds v. Porter*,
760 P.2d 816 (Okla. 1988) .......... 15, 20

*Rimbert v. Eli Lilly and Co.*,
647 F.3d 1247 (10th Cir. 2011) .......... 2

*Strickland v. Stephens Prod. Co.*,
411 P.3d 369, 375 (Okla. 2018) .......... 15, 20

*Telex Corp. v. Hamilton*,
576 P.2d 767 (Okla. 1978) .......... 10

*White v. Wint*,
638 P.2d 1109 (Okla. 1981) .......... 9

**Statutes**

Okla. Stat. tit. 12, § 832.1 .......... 20

Okla. Stat. tit. 15, § 221 .......... *passim*

Okla. Stat. tit. 15, §§ 421-430 .......... 8, 16, 18, 19

Okla. Stat. tit. 20, § 1601. .......... 12

Okla. Stat. tit. 20, § 1602 .......... 12, 13

Okla. Stat. tit. 42, § 141 .......... 22

Okla. Stat. tit. 42, § 144 .......... 23

**Other Authorities**

4 Steven G.M. Stein, Construction Law (2006) .......... 17

*Drill Rig*, TEXAS INTERNATIONAL OILFIELD GLOSSARY OF TERMS, https://www.texasinternational.com/blog/oilfield-glossary .......... 3

H.B. 1701, 1st Session of the 51st Legislature (2007) .......... 11, 12, 20, 21

James Duffy O' Connor¸ *Wrestling with Reform: Indemnification Agreements, the Statutory Bars, Promises to Procure, and Insurance Products for the Construction Industry* No. 1 .......... 17

*Work*, NEW OXFORD AMERICAN DICTIONARY 1990 (3d ed. 2010) .......... 9

News Release, Bureau of Lab. Stat., Nat'l Census of Fatal Occupational Inj. in 2020 (Dec. 16, 2021) https://www.bls.gov/news.release/pdf/cfoi.pdf .......... 17

Oklahoma Constitution Art. 2, § 7 .......... 21

Oklahoma Constitution Art. 5, §59 .......... 14, 15

S.B. 1297, 2nd Session of the 45th Legislature (1996) .......... 11, 12, 20, 21

*Well*, BLACK'S LAW DICTIONARY (11th ed. 2019) .......... 3, 23

Defendants respectfully move this Court to reconsider and reverse its Order (Doc. 10) denying Defendants' Motion to Dismiss (Doc. 7). In the alternative, Defendants respectfully move this Court to certify questions of Oklahoma law to the Oklahoma Supreme Court.

## I. MOTION TO RECONSIDER

This case involves the validity of a Master Services and Supply Agreement ("MSSA") entered into by two sophisticated oil and gas industry participants, Plaintiff Jet Maintenance, Inc. ("Jet Maintenance") and Defendant Devon Energy Production Company, L.P. ("Devon").[1] The parties agreed that the MSSA, including the indemnification provisions included therein, would govern the surface work Jet Maintenance was to perform at a Devon location that would eventually include a new well. Plaintiff filed this lawsuit on March 30, 2022 in order to retroactively invalidate its contractual agreement eight years after entering into it.

The basis of Plaintiff's claim is that Plaintiff's agreement to indemnify Devon should be void pursuant to Oklahoma's construction anti-indemnity statute, Okla. Stat. tit. 15, § 221. Devon moved to dismiss based on the legal inapplicability § 221, as well as Oklahoma law and public policy that values the freedom to contract, enforces indemnity agreements, and requires a narrow and strict interpretation of any anti-indemnity statute that would void a parties' mutual contractual obligation. (Doc. 7). The Court denied Defendants' Motion on the basis that the parties' contract falls within § 221 construction

[1] All three Defendants were parties to the MSSA, but only Defendant Devon and Plaintiff Jet Maintenance were parties to the specific contract at issue whereby Jet Maintenance was serving as the general contractor to build the well pad. Doc. 7, Motion at ECF p. 7, fn1.

anti-indemnity statute. However, the applicability of the statute comes down to *what* was being constructed by Jet Maintenance. The basis of the Court's determination appears to confuse a gravel well pad (at issue here) with a drilling rig (not at issue here). This distinction is an important one and application of the statute to a well pad would merit a reversal of the Court's decision. The Court's Order likewise applies the wrong legal standard in declaring as void an otherwise valid contract.

**A. Legal Standard for Reconsideration**

A district court has the authority to review, revise, or modify an interlocutory, non-appealable order any time prior to entering final judgment in a case. *See Rimbert v. Eli Lilly and Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) ("district courts generally remain free to reconsider their earlier interlocutory orders. . . . This principle remains true even when a case is reassigned from one judge to another in the same court."). An order denying a motion to dismiss is not a final, appealable order. *See Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC*, 703 F.3d 1147, 1150 (10th Cir. 2013) ("An order denying a motion to dismiss is not a final appealable order if it ensures that litigation will continue in the District Court."). Accordingly, this Court may reconsider, modify, or reverse its ruling on Devon's Motion to Dismiss at any time prior to the entry of a final order in this case.

**B. Basis for Reconsideration: A well pad is not a drilling rig or a structure**

The contract at issue required Jet Maintenance to do surface work for a well pad, including the delivery of aggregate (gravel) that was at issue when the incident occurred. Doc. 7, Motion at ECF p. 16; Doc. 1-3, Bid (estimating costs to build the pad site); Doc.

1-4, Invoice (describing work for the well pad). Common understanding of a well pad is simply a cleared surface location where a well will ultimately be placed. The pad basically resembles a large flat parking lot made out of gravel. The gravel is not "composed of parts purposefully joined together," (Doc. 10, Order at 3 (defining "structure")) but is rather just rocks/aggregate lying on the flat ground.



Image: A well pad

The well that will ultimately be placed on the surface location is, at its most basic function, a hole dug into the earth that serves the purpose of bringing oil or other hydrocarbons to the surface. *See Well*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas.").

A drilling rig, on the other hand, is a large piece of equipment utilized in the drilling process of a well. *Drill Rig*, TEXAS INTERNATIONAL OILFIELD GLOSSARY OF TERMS, https://www.texasinternational.com/blog/oilfield-glossary ("Drill Rig: The machinery that's used to drill oil and gas wells"). It is a temporary piece of equipment that is

transported from drill site to drill site, and is removed from the site once the drilling work is completed.

A drilling rig is neither the object of the Jet Maintenance contract (which was specific to surface work on the pad, not drilling), nor the ultimate purpose of the pad (to house a well, not a drilling rig). Jet Maintenance was not a drilling contractor, and they were in no way hired to perform drilling services. *See* Doc. 1, ¶ 21(a) (the incident occurred while aggregate was being delivered to the pad site); Doc. 1-3, Bid (estimating costs to build the pad site); Doc. 1-4, Invoice (describing work for the well pad). They were also not hired to construct a rig. Based on the contract attached to the Complaint, it is apparent as a matter of law that the Jet Maintenance work did not involve drilling, did not involve a drilling rig, and did not utilize a drilling rig. A drilling rig was never on site during the performance of the Jet Maintenance contract, and there is nothing in the Complaint or the contract attached to the Complaint that would suggest otherwise. No party to this case has ever suggested a drilling rig is at issue.

In denying Devon's Motion to Dismiss, the Court held that § 221 applied to void the parties' contract because "It is clear that an oil **drilling rig** is a "structure" under either definition. Thus § 221 would apply to the MSSA and the indemnity agreement is therein void." Doc. 10, Order at 2. The Court further reasoned, "Alternatively, it is undisputed that the purpose of the MSSA was to construct a site for the erection of a **drilling rig**." Doc. 10, Order at 3. This is an error in reciting a somewhat nuanced, but important, distinction in what the parties contractually agreed to build—a flat surface. While the surface will ultimately include a *well*, the well is not a drilling rig. The drilling rig is merely a piece of

equipment, albeit large, used in the process of creating the hole in the ground and in no way related or applicable to the contract at issue here.[2] The parties *do* dispute that statement that the purpose of the contract was for a drilling rig.

Defendants respectfully request reconsideration based on the error in describing the parties' contract.

**C. Basis for Reconsideration: A well is not a structure**

The future well that would be placed on the pad is also not a structure. Recently, C.C. Forbes, LLC ("Forbes"), in the case *Chesapeake Operating, LLC v. C.C. Forbes, LLC*, No. CIV-20-557-R (W. D. Okla. March 8, 2023), Order attached as Exhibit 1, relied on this Jet Maintenance case to try to invalidate its own contractual indemnity agreement with Chesapeake. Forbes argued that if a drilling rig was a "structure" in this Jet Maintenance case, then the well it was performing repair work to would be a structure within the meaning of § 221 for the same reasons. *Id*. at *8. Judge Russell rejected Forbes' argument, granted Chesapeake's motion for summary judgment, and enforced Forbe's agreement to indemnify Chesapeake pursuant to their MSSA. Judge Russell first noted that a well is a hole in the ground. *Id*. at *9. The Court held, "In the Court's view, a 'structure' would not be understood in the ordinary sense to encompass an oil and gas well." *Id*. The Court further applied the doctrine of *noscitur a sociis* and analyzed the terms surrounding the word "structure" in the statute (building, building site, structure, highway, street, etc). *Id*. at *10. The court held "None of the terms surrounding the word "structure" suggest that

[2] A well is also not within the parties' contract. Doc. 1-3, Bid (estimating costs to build the pad site); Doc. 1-4, Invoice (describing work for the well pad).

the word was intended to refer to oil and gas wells or workover rigs." *Id*. That same reasoning would apply here. The statute does not apply to construction, repair or maintenance work on a well or the well pad.

Devon respectfully requests reconsideration in light of the Court's determination that well maintenance work does not invoke § 221. Just as a well is not a "structure," a well pad would not be either.

### D. Basis for Reconsideration: the statute requires that the contract at issue be for ***construction of*** a structure, not simply ***use of*** a structure

The Court rendered the parties' contract void because a piece of equipment (the drilling rig) is "composed of parts purposefully joined together" and would be used on site at a later point in time. But the anti-indemnity provisions of § 221 do not apply due to mere use of equipment during the performance of construction, repair or maintenance. Applying the construction anti-indemnity statute to a situation where the "structure" that invoked the statute (a drilling rig): (1) was not what was being built; (2) was not being used as part of the agreement at issue; and (3) was not on-site at any time during the course of performance of the parties' the agreement violates the plain terms of the statute and expands the application of a "structure" in § 221 to potentially unlimited situations.

First, the fundamental problem with this interpretation is that the Court's holding applied § 221 to the use of equipment for a project when that equipment (the drilling rig) was not being constructed. This finding contradicts the statute's plain words, which invalidates indemnity agreements only if the parties' agreement is for the construction

/maintenance / repair **of** the building or "structure," not just an agreement for services that *use* a "structure" as a piece of equipment. Okla. Stat. tit. 15, § 221.

> A. For purposes of this section, "construction agreement" means a contract, subcontract, or agreement for construction, alteration, renovation, repair, or maintenance **of** any building, building site, structure, highway, street, highway bridge, viaduct, water or sewer system, or other works dealing with construction, or for any moving, demolition, excavation, materials, or labor connected with such construction.

*Id*. (emphasis added). Similarly, the Court reasoned that the ultimate purpose of the well pad was so that another party could use a drilling rig on the site. Doc. 10, Order at 3. But § 221 applies only where ***this*** contract (not a future contract) is for the construction, repair, or maintenance of the building or structure. *Id*. (the void construction agreement means "a contract" for the construction of the building or structure). The § 221 anti-indemnity provisions do not apply merely because tools or equipment (a "structure") are utilized by *other contractors* under *other contracts* to perform *different services* not at issue in the contract in question.

Second, while the Court focused on the drilling rig that was "composed of parts purposefully joined together," applying the anti-indemnity statute in such a context creates a nearly unlimited potential scope. For example, drilling a well (not being done here) does involve large equipment like a drilling rig, but it also includes relatively smaller and common equipment and tools—like automobiles,, mechanical tools, and computers—all of which are also "composed of parts purposefully joined together." If the potential use of a drilling rig invokes the construction anti-indemnity statute, then the potential use of any equipment "composed of parts purposefully joined together," would also invoke the statue

for the same reason. This interpretation expands § 221 far outside the context of the construction trade. This encompasses the automotive industry, landscaping industry, farming and ranching, utilities, manufacturing, hospitality, food service, oil and gas exploration, and practically any other industry that uses any kind of equipment, vehicle, tool, computer or machine in the context of repair, maintenance, or construction. This expansion is particularly troublesome in light of the contradiction to the statute's title, which suggests to the public that the statute is limited to "construction." This interpretation also contradicts the Oklahoma Legislature's allowance for indemnity agreements, Okla. Stat. tit. 15, §§ 421-430, and the Oklahoma Supreme Court's binding precedence that indemnity agreements are generally valid in Oklahoma. *Fretwell v. Protection Alarm Co.*, 764 P.2d 149, 152 (Okla. 1988)("An indemnity agreement is a valid agreement in Oklahoma, and is governed by statute."). This broad application is not within the letter or the spirt of the law.

Defendants respectfully request reconsideration based on the error in applying the structure to a situation in which that structure was not being built, coupled with the problematic and potentially unlimited scope of the Order.

**E. Basis for Reconsideration: A well pad is not "other works dealing with construction."**

The Court also applied the portion of the anti-indemnity statute that loops in "other works dealing with construction." The Court rejected Defendants' argument that the doctrine of *ejusdem generis* precludes a court from construing a statute's general words to amplify the particular terms proceeding them, requiring instead an interpretation that

general terms are restricted and explained by the specific terms. Doc. 9, Reply at ECF p. 5; *White v. Wint*, 638 P.2d 1109, 1113-1114 (Okla. 1981). Defendants respectfully request reconsideration of this issue in light of the Oklahoma Supreme Court's direction in *White*.

But moreover, the phrase "other ***works*** dealing with construction" refers to additional list of *verbs* (construct, repair, maintain, etc.), not an additional noun to which the verb is applying to (building, structure, highway). The ordinary definition of the word "works" is (1) an "activity involving mental or physical effort done in order to achieve a purpose or result; [or (2)] a task or tasks to be undertaken, something a person or thing has to do." *Work (plural works)*, NEW OXFORD AMERICAN DICTIONARY 1990 (3d ed. 2010). Defining "works" in the context of an "activity" or "task" makes sense with the rest of the phrase, which requires the "works" to be *dealing* with construction. Only another verb can be "dealing" with something, such as construction. The statutory prohibition on indemnity contracts is narrowly limited to apply when construction-type activities (construct, repair, maintain, or other *tasks* or *activities* dealing with construction) are being performed *on certain things*: building, building sites, structure, highways, street, highway bridge, viaduct, water or sewer plants. The generic phrase "or other works dealing with construction" does not expand the specific list to any possible thing that can be built, maintained, or repaired. To find otherwise would both misapply the word "works" and render the specific list meaningless.

Defendants respectfully request reconsideration based on the error in applying or defining what is meant by "works" in the phrase "other works dealing with construction."

### F. Basis for Reconsideration: Wrong standard

The Court twice indicated it was not persuaded by Defendants' attempt to narrowly apply the anti-indemnity statute that would void otherwise valid contracts. Doc. 10, Order at 2-3. But a narrow construction is required in light of Oklahoma's public policy to value the freedom to contract.

> That the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare.

*Telex Corp. v. Hamilton*, 576 P.2d 767, 769 (Okla. 1978); Doc. 7, Motion at ECF p. 11.

The Oklahoma Supreme Court mandates "that contracts **should not be declared void** on the ground of public policy except in those cases that are **free from doubt**." *Dayton Hudson Corp. v. Am. Mut. Liab. Ins. Co*., 621 P.2d 1155, 1160 (Okla. 1980)(emphasis added); Doc. 7, Motion at ECF p. 19. "One of the law's important functions is to uphold the binding obligation of a promise rather than to enable the parties to escape from it on the pretext of public policy. Contracts **must stand** unless it **clearly** appears that public right or public weal is contravened." *Id*. (emphasis added). In other words, if there is *any doubt* or *potential for doubt*, this contract "must stand" and "should not be declared void." *Id*.

The Legislature chose not to include a well pad or even a well or drilling site in the list of things that must be being constructed or maintained for purposes of the § 221 anti-indemnity statute. There is inherent doubt, and therefore it is not free from doubt, that the statute would include a well pad without stating a well pad or anything of the like.

An expansive interpretation of § 221 also directly conflicts with legislative intent, which further establishes doubt. (*See* Doc. 12 at ECF p. 6). In 1996, Senator Henry presented Senate Bill 1297, the Oklahoma Oilfield Anti-Indemnity Act, which would have declared oilfield indemnity contract provisions void. It would have declared void any contract indemnity provision pertaining to "a well for oil" or services in connection with "any well drilled" for the purpose of constructing any mine shaft or other structure intended for use in the exploration for or production of any mineral. The Judiciary Committee abandoned Senator Henry's Bill after two sessions. S.B. 1297. It was never enacted into law. Later, in 2007—the very next year after the construction anti-indemnity act was passed—, House Bill 1701 would have provided § 221.1 and impacted any agreements "pertaining to a well for oil, gas or water, or mine for a mineral." But that bill failed in the Economic Development and Financial Services Committee. It was never enacted into law. To judicially impose a prohibition for indemnity contracts relating to a well (or the equipment used to drill the well, or the surface location for the well) when such statute was expressly rejected by the legislature cannot be free from doubt.

The parties have also agreed that there is doubt as to invalidity of the indemnity agreement. Plaintiffs contractually acknowledged, agreed and admitted that the risk allocation and indemnity provisions are reasonable, valid and enforceable.

> To the fullest extent permitted by law, it is the intent of Company [Defendants] and Contractor [Jet Maintenance] that the insurance requirements, the indemnifications, the defense, and other obligations are separately construed to be valid and enforceable.

Doc. 7, Motion at ECF p. 13; Doc. 1-1 at ECF p.10, ¶¶ S(1), U(1). Even Plaintiffs had doubt as to whether the contract should be void. *Id*.

Here, Defendants respectfully submit that they have presented a reasonable interpretation of § 221, supported by Oklahoma law, which creates at least some doubt as to whether § 221 would void the parties' contract. Even Plaintiffs, by their written words, did not believe the anti-indemnity statute should void their agreement, which necessarily cannot be "free from doubt." If there is *any* doubt, the contract "must stand."

Defendants respectfully request reconsideration in light of the wrong standard that was applied in declaring a contract void as against public policy.

## II. MOTION TO CERTIFY QUESTIONS TO THE OKLAHOMA SUPREME COURT

In the alternative, the statute is still not applicable here because it violates Oklahoma's Constitution. These constitutional issues are a matter of first impression of state law. Accordingly, Defendants respectfully request that this Court certify two questions to the Oklahoma Supreme Court.

The Revised Uniform Certification of Questions of Law Act, codified in Oklahoma at Okla. Stat. tit. 20, § 1601 *et seq*., authorizes the Oklahoma Supreme Court to:

> Answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state.

Okla. Stat. tit. 20, § 1602.

The request for declaratory judgment in this lawsuit requires a determination of two issues of first impression that have not yet been addressed by the Oklahoma Supreme

Court. First, the constitutionality of Oklahoma's construction anti-indemnity statute has never been addressed by the Oklahoma Supreme Court, and resolution of the statute's constitutionality should be determinative of an issue in the pending litigation. Likewise, the validity of risk-allocation agreements in private contracts relating to oil and gas well site or drilling operations has not been addressed in the context of the construction anti-indemnity statute.

Accordingly, Defendants hereby move to certify the following questions to the Oklahoma Supreme Court:

1. Whether Oklahoma's construction anti-indemnity statute, Okla. Stat. tit. 15, § 221 applies to assembly of a well pad or the drilling of an oil and gas well; and

2. Whether Oklahoma's construction anti-indemnity statute, Okla. Stat. tit. 15, § 221, violates the Oklahoma Constitution.

Because the questions above have not been addressed by the Oklahoma Supreme Court or any of the listed representatives of the State of Oklahoma, this Court is authorized by Okla. Stat. tit. 20, § 1602 to submit these unsettled questions to the Oklahoma Supreme Court for resolution.

### A. Facts Relevant for Certification

1. The terms of the MSSA (Doc. 1-1), the bid (Doc. 1-3), and the Invoice (Doc. 1-4) are incorporated herein by reference.

2. Plaintiff Jet Maintenance entered into an MSSA prior to performing surface work for Defendant Devon. (Doc. 1-1). Jet Maintenance agreed perform work for Devon on future well sites as an independent contractor subject to the indemnity provisions of the MSSA. (Doc. 1-1).

3. The indemnity provision Jet Maintenance agreed to before entering the wellsite requires Jet Maintenance to indemnify Devon for any claims of loss or death of Jet Maintenance employees, regardless of who may be at fault. Doc. 1-1 at ECF p.8.

4. There is a similar provision on the next page whereby Devon agreed to indemnify Jet Maintenance for injuries or death of Devon's employees. Doc. 1-1 at ECF p.9.

5. The parties recognized a potential risk of injury or death and agreed to the up-front allocation of that risk so that the risk can be adequately insured and managed. Doc. 1-1 at ECF p.8, ¶ S(1).

6. The parties expressed their intention that the reciprocal indemnity provisions be valid and enforceable. Doc. 1-1 at ECF p.10, ¶ U(1).

7. Jet Maintenance was hired by Devon to oversee the surface work involved in the creation of a well pad. Doc. 1-3, Bid (estimating costs to build the pad site); Doc. 1-4, Invoice (describing work for the well pad).

8. A fatality accident occurred on site while Andrew West, an employee of Jet Maintenance, was coordinating the on-site contractors on behalf of Jet Maintenance.

9. The incident occurred at a well pad site while "aggregate" was being delivered for purposes of constructing the well pad. Doc. 1, ¶ 21(a).

10. The parties did not enter into a contract for the drilling of a well, the construction of a drilling rig, or the construction of a well.

11. Andrew West was present on the well site only because he was performing services on behalf of Jet Maintenance pursuant to the MSSA. Doc. 1, ¶¶ 21; 33. All services or work provided by Jet Maintenance to Devon, including the services Andrew West performed at Devon's well site, were performed subject to all the terms and conditions of the MSSA. Doc. 1, ¶ 33. The incident directly or indirectly arises out of or is related to Jet Maintenance's performance under the MSSA.

12. Andrew West's parents asserted claims against Devon. The claims arise out of Andrew West's performance as an employee of Jet Maintenance. Devon tendered its indemnity to Jet Maintenance pursuant to the MSSA. Jet Maintenance filed this lawsuit to invalidate its contractual indemnity agreement pursuant to Okla. Stat. tit. 15, § 221. Devon denies § 221 is applicable to the parties' contract. Devon also claims § 221 violates Oklahoma's Constitution.

### B. Special Law Violation Under Art. 5, § 59

Oklahoma's anti-indemnity statute for construction agreements is an unconstitutional special law under Art. 5, §59 of the Oklahoma Constitution. Article 5, § 59 of the Constitution of the State of Oklahoma provides "[l]aws of a general nature shall

have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted." The Oklahoma Supreme Court devised a three-part test used in determining an impermissible special law. *Reynolds v. Porter,* 760 P.2d 816, 822 (Okla. 1988).

1. The first prong requires the court to determine whether § 221 is a special or general law. *Id*. A statute is a special law when part of a similarly situated class receives differential treatment. *Id*.

2. The second prong requires the court to determine whether "the subject of the legislation is reasonably susceptible of general treatment or if, on the other hand, there is a special situation possessing characteristics impossible of treatment by general law." *Id*.

3. The final prong requires a special law to be "reasonably and substantially related to a valid legislative objective" in order to constitute a permissible law. *Id*. Courts consider whether there is a distinctive characteristic that (1) warrants differential treatment and (2) furnishes a practical and reasonable basis for discrimination. *Id*.

Without a specific characteristic that provides a sound foundation for discriminatory treatment, the statute violates Article 5, § 59. Such a "distinction is considered arbitrary and will not withstand constitutional scrutiny." *Strickland v. Stephens Prod. Co.*, 411 P.3d 369, 375 (Okla. 2018) (citing *Grant v. Goodyear Tire & Rubber Co.*, 2000 OK 41, ¶ 10, 5 P.3d 594, 599). Section 221 fails the three-prong test provided by *Reynolds* because it is an impermissible special law.

### 1. What does Section 221 do?

Section 221 applies to entities that engage in construction agreements, regardless of how an indemnity provision's impact varies under the facts of a particular case.

**Section 221 - Construction Agreement - Insurance and Indemnity - Circumvention Void**

> A. For purposes of this section, "construction agreement" means a contract, subcontract, or agreement for construction, alteration, renovation, repair, or maintenance of any building, building site, structure, highway, street, highway bridge, viaduct, water or sewer system, or other works dealing with construction, or for any moving, demolition, excavation, materials, or labor connected with such construction.

Subsection B specifies that indemnity provisions in construction agreements are considered "void and unenforceable as against public policy." Okla. Stat. tit. 15, § 221(B).

> B. Except as provided in subsection C or D of this section, any provision in a construction agreement that requires an entity or that entity's surety or insurer to indemnify, insure, defend or hold harmless another entity against liability for damage arising out of death or bodily injury to persons, or damage to property, which arises out of the negligence or fault of the indemnitee, its agents, representatives, subcontractors, or suppliers, is void and unenforceable as against public policy.

### 2. Step 1: How does Section 221 separate classes?

Oklahoma's legislative and judicial branches have both recognized the validity of an agreement where one party may indemnify another party for death or injury during the performance of an agreement, even if those indemnity agreements involve the indemnitee's own negligence. *See Fretwell v. Protection Alarm Co.*, 1988 OK 84, 764 P.2d 149, 152. (holding that where the intention to indemnify someone against its own alleged negligence "is unequivocally clear from an examination of the contract, such an agreement is enforceable."); Okla. Stat. tit. 15, § 421-430.

Yet, despite this general and over-arching understanding that indemnity agreements are valid and enforceable, § 221 voids indemnity agreements in construction. Anti-indemnity statutes for construction are typically justified based on the public policy

rationale that: (1) construction sites are dangerous, and if someone is not personally liable they might be more reckless and cause more potential injuries at an already dangerous site; and (2) there is a perceived difference in bargaining power in subcontractors and general contractors. *See gen.* James Duffy O' Connor¸ *Wrestling with Reform: Indemnification Agreements, the Statutory Bars, Promises to Procure, and Insurance Products for the Construction Industry*, 1 No. 1 Journal of the American College of Construction Lawyers 4 (noting "[a] party that knows it will not be financially responsible has little incentive to take any preventive measures to ensure its negligence does not hurt a third party.); *see also* 4 Steven G.M. Stein, Construction Law (2006), at ¶ 13.17[2][b] (stating "these statutes are believed to combat overreaching in the construction industry where small contractors and suppliers are often powerless to truly negotiate an allocation of risk through indemnity agreements.").

Based on this rationale to enact anti-indemnities statutes, the overarching class that is being addressed would be as follows:

> **Class: Anyone that may conduct dangerous activities with potentially unequal bargaining power.**

There are multiple entities/ industries/ or activities that would fall within that realm and thus create various sub-classes. As just one example, the U.S. Bureau of Labor Statistics has identified eight occupations that entail above average fatality rates: (1) fishing and hunting, (2) logging, (3) roofing, (4) aircraft piloting, (5) recyclable material collecting, (6) structural iron and steel manufacturing, (7) trucking, and (8) construction trade. News Release, Bureau of Lab. Stat., Nat'l Census of Fatal Occupational Inj. in 2020, (Dec. 16,

2021) https://www.bls.gov/news.release/pdf/cfoi.pdf. Each of these industries, among others, would constitute a sub-class within the overarching class based on the stated public policy rationale.

Although each of these industries or occupations have similarly situated (or heightened) fatality rates and potential or claimed uneven bargaining power between parties, Oklahoma's anti-indemnity statute applies to only one sub-class, the construction trade. Therefore, there is a statutory prohibition for indemnity agreements in the construction trades sub-class, but there is not a statutory prohibition for indemnity agreements in all other industries and activities within the class.

### 3. **Step 2: Can a general law be applied?**

When it comes to indemnities for potentially dangerous activities, a general law already exists. Generally, indemnities are expressly allowed, even in agreements that contemplate potential injury or death. An indemnity is a "contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person." Okla. Stat. tit. 15, § 421. "An indemnity agreement is a valid agreement in Oklahoma, and is governed by statute." *Fretwell v. Protection Alarm Co.*, 1988 OK 84, 764 P.2d 149, 152; Okla. Stat. tit. 15, §§ 421-430. In expressly upholding the validity and enforceability of a contractual indemnity provision, the Oklahoma Supreme Court in *Fretwell* explained,

> Broadly speaking, a promise of indemnity for the performance of an act not illegal, immoral, or against public policy is valid.... [I]t is now the prevailing rule that a contract may validly provide for the indemnification of one against, or relieve him from liability for, his own future acts of negligence

> provided the indemnity against such negligence is made unequivocally clear in the contract.

*Id*. quoting 41 Am. Jur. 2d *Indemnity* § 9 (1968). The Court held that where the intention to indemnify someone against its own negligence "is unequivocally clear from an examination of the contract, such an agreement is enforceable." *Id*. at 152-53.

If an indemnity agreement contemplates a potential injury or death, then there is already some level of risk involved in the situation. Thus, Oklahoma has expressed a public policy to allow the parties to contract for risk allocation even in potentially dangerous activities that involve risk of injury or death. Okla. Stat. tit. 15, §§ 421-430.

Section 221 is not a general law because it does not include all subclasses that fall within the public policy concerns. A general law would either prohibit indemnity agreements entirely, or prohibit indemnity agreements in all dangerous industries instead of singling out the construction industry. The statutory language expressly limits the application of anti-indemnification to construction, despite the similar (or greater) fatality rates among at least eight other industries. If a construction agreement does not fall within the exceptions under subsections C or D, an indemnity provision is *automatically* deemed void, in contrast to other subclasses which are not subjected to § 221. Okla. Stat. tit. 15, § 221(B—D). The fact that the statute singles out construction agreements prevents the statute from applying to any other potentially dangerous industries, including the aforementioned industries which similarly have fatalities within the occupation. Section 221 does not apply generally to all industries, or even all claimed "dangerous" industries. Therefore, § 221 must be a permissible special law to meet constitutional scrutiny.

### 4. Step 3: Is the special treatment legislatively justified?

Treating a subclass differently is not necessarily unconstitutional as long as the difference is justified by "a valid legislative objective." *Reynolds*, 760 P.2d at 822. The legislative objective though must warrant differential treatment with a "practical and reasonable" basis for discrimination. *Strickland*, 2018 OK 6, ¶ 11, 411 P.3d at 375.

Here, the expressed legislative objective involves the potentially dangerous activities of a construction site and perceived bargaining power. *See gen. Supra.*, James Duffy O' Connor¸ *and see also, Supra.*, 4 Steven G.M. Stein. But that legislative objective provides no reason to separate out "construction" sub-class from other industries that meet the same legislative objective, such as iron and steel workers, transportation, logging, fishing and hunters, aircraft, etc. In fact, the manufacturing industry has a separate (and different) indemnity statute that affirmatively *requires* certain indemnities above and beyond potential contractual indemnities. Okla. Stat. tit. 12, § 832.1. As a result, despite the fact that manufacturing workers, structural iron and steel workers, aircraft workers, etc. are similarly situated to construction workers, the subclasses are treated differently. The industries present the same purported policy concerns. There is no valid legislative objective to only impose contractual limitations for construction and not all similarly situated industries.

What's more, there is certainly not a valid legislative objective to apply an anti-indemnity to the oil and gas well sites because the legislature has twice analyzed such statutes and refused to pass a law imposing contractual limitations relating to drilling a well. S.B. 1297, 2nd Session of the 45th Legislature (1996); H.B. 1701, 1st Session of the

51st Legislature (2007). The Oklahoma legislature twice refused to find a "legislative objective" to outlaw indemnity agreements for oil and gas well sites. The legislative process takes into account meetings, hearings and negotiations with industry representatives on all sides of the issue while crafting Oklahoma's law. After this legislative process, considering Oklahoma public policy and industry practice and input, the Oklahoma Legislature declined to impose an anti-indemnity law for the drilling of a well. Thus, the only "legislative objective," as determined by Oklahoma's Legislature, is that anti-indemnity statutes should *not* apply to the oil and gas well site. There is not a practical or reasonable basis to discriminate the construction industry, and especially an oil and gas well pad or oil and gas well.

**C. Due Process Violation Under Art. 2, § 7**

Oklahoma oil and gas entities have little to no notice that a court would apply § 221 to well site agreements or even well pads. The driving force behind the due process clause resides in the founding fathers' pre-constitutional demands for fair notice to those subjected to laws. The due process clause enshrines the imperative to ensure those who may be subject to laws receive adequate notice. The court's inclusion of well sites, and well pads, to § 221 renders § 221 unconstitutional pursuant to the due process clause under Art. 2, § 7 of the Oklahoma Constitution.

**1. Judicial ruling contradictory to legislative decisions violates due process**

The Legislature has expressly considered oil and gas anti-indemnity statutes and rejected them. The Oklahoma Legislature has repeatedly denied imposing a contractual

limitation to indemnity provisions for oil and gas drill sites. S.B. 1297, 2nd Session of the 45th Legislature (1996); H.B. 1701, 1st Session of the 51st Legislature (2007). As set forth above, that legislative process involves notice to the public, and negotiations, hearings and debate in response to that public notice. The Legislature's rejection of an oil and gas anti-indemnity statute put the industry on notice that the anti-indemnity laws do not apply to a well site, the drilling of a well, or the creation of the well pad. In light of this legislative history and lack of express language in the statute referencing well sites, well pads, or even drilling operations, well site owners received no constructive notice that they may be subject to the Oklahoma anti-indemnity statute.

### 2. <u>Error in statutory construction violates due process</u>

Similarly, by applying the construction anti-indemnity statute to well sites, the lower court broadened the construction subclass to include an occupation that does not fall within the plain and ordinary meaning of construction. Unlike other state statutes that identify well-sites in an anti-indemnity statute, Oklahoma's statute defines specific activities, but never references "well" or "drilling" or "well pad" or related activities. Texas, New Mexico, Wyoming, and Louisiana, on the other hand, specify whether oil and gas activities are included in anti-indemnity statutes. Doc. 7, Motion at ECF p. 18 (collecting statutes). Likewise, Oklahoma lien law similarly recognizes the distinction between "structures" and oil and gas drilling. The Oklahoma Legislature separated general construction services and oil and gas related activities. The construction lien statute applies to labor for any "building, improvement or <u>structure</u> thereon," Okla. Stat. tit. 42, § 141, and a separate statute for "Oil and Gas Well Liens" applies to labor or supplies for "digging, drilling, torpedoing,

completing, operating, or repairing of any oil or gas well . . ." Okla. Stat. tit. 42, § 144. If a "structure" actually included the drilling process, then a separate lien statute would not be necessary and would be contradictory to the mechanic's lien statute.

The plain and ordinary definition of a "well" is not imbedded into the other activities that are listed in the construction statute. Black's Law Dictionary, a source relied on by the lower court, defines wells as "a hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas." *Well*, BLACK'S LAW DICTIONARY (11th ed. 2019). The plain and ordinary definition of a well does *not* include "building, building site, structure, highway, street, highway bridge, viaduct, water or sewer system, or other works dealing with construction." Okla. Stat. tit. 15, § 221(A). Accordingly, a plain reading of the statute does not encompass the drilling of a well or the well pad, and does not put the public on notice that agreements related to the drilling of a well would violate the anti-indemnity statute.

The statute was applied in a way not supported by the common meaning of the statutory words. The public therefore lacks fair notice that "wells" or "well pads" are subjected to this law. This creates a due process violation.

**3. <u>Application of the "construction" statute to nearly limitless activities violates due process</u>**

The Court defined a "structure" to include something "artificially built up or composed of parts purposefully joined together," and then concluded that the existence of drilling rig (a piece of equipment for the drilling of a well) constitutes a potential "structure" on a drill site, even when the contract at issue was for the well pad that did not utilize a drilling rig or even have a drilling rig on site at any time during the completion of

the well pad contract. As set forth above, the Court interpreted § 221 to apply in a situation where the drilling rig (the "structure" that invokes the statute) was (1) not what was being built; (2) not being used as part of the contract at issue; or (3) not actually on site at any time during the course of performance for the Agreement. This application of a "structure" expands the claimed "construction" statute to potentially unlimited situations.

This expansion is particularly troublesome in light of the contradiction to the statute's title, which suggests to the public that the statute is limited to "construction."

> **Section 221 - Construction Agreement - Insurance and Indemnity - Circumvention Void**

This expansion also contradicts the statute's plain words, which only applies if the parties' agreement is for the construction of the "structure," not just an agreement for services that *use* a "structure" as a piece of equipment, or for services where the claimed "structure" was not part of the agreement at issue. The expanded interpretation and application of the "construction" anti-indemnity agreement usurped all public notice, meetings, and debate that would normally be required for a legislative enactment. Those industries and entities now included in the anti-indemnity statute, such as the oil and gas industry's well-site activities, were deprived of adequate notice that the law would be applied to them.

**4. Discrimination in industries violates due process**

In addition, the Oklahoma Constitution's due process section provides a functional equivalent to the federal Equal Protection Clause. *Hendricks v. Jones ex rel. State ex rel. Oklahoma Dep't of Corr.,* 349 P.3d 531, 534 (Okla. 2013). This is based on the idea that although "law[s] may be general and … apply to a designated class" it must operate

uniformly upon all the subjects within the class. *Burks v. Walker*, 109 P. 544, 549 (Okla. 1909). Although the due process section doesn't provide "an absolute guarantee of equality of operation or application of state legislation," there are protections against arbitrary discrimination. *Id*. Since the classification in § 221 addresses an unprotected class, the statute must satisfy the rational basis test.

The discrimination applicable to a due process violation is the same discrimination discussed above that creates a special law. There is not a rational basis to discriminate construction trades from other similarly situated industries that may invoke the same "dangerous" policy concerns.

## III. CONCLUSION

Devon respectfully requests reconsideration of the Court's Order (Doc. 10) denying Devon's Motion to Dismiss (Doc. 7, Doc. 9). In the alternative, Devon respectfully requests that the Court certify two questions of first impression of Oklahoma state law to the Oklahoma Supreme Court, as set forth above.

Respectfully submitted,

*/s/ Timothy J. Bomhoff*

Timothy J. Bomhoff, OBA #13172
Laura J. Long, OBA #22215
Katelyn M. King, OBA #33937
McAfee & Taft A Professional Corporation
Two Leadership Square, 8th Floor
211 North Robinson
Oklahoma City, OK 73102-7103
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
tim.bomhoff@mcafeetaft.com
laura.long@mcafeetaft.com
katelyn.king@mcafeetaft.com

**ATTORNEYS FOR DEFENDANTS, DEVON ENERGY PRODUCTION COMPANY, L.P., DEVON GAS SERVICES, L.P. AND SOUTHWESTERN GAS PIPELINE, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following registrants:

Jon Cartledge
Jason L. Callaway

*/s/ Timothy J. Bomhoff*